The 4th District Appellate Court of the State of Illinois has now convened. The Honorable Thomas M. Harris presiding. Good morning, counsel. This is case number 4-23-0204, Phillips et al. v. Havenar. Counsel, could you state your appearances, please, first for the appellant? Daniel Noll on behalf of the appellant. All right. Thank you. And for the appellee? Jason Schutte on behalf of the appellee. All right. Thank you. Mr. Noll, you may proceed with your argument. Thank you. We are here today subsequent to a jury trial in this matter. And the first issue that we wanted to address was the we perceive to be the court's abuse of discretion and limiting the testimony of Rebecca Bush. In trial, both parents testified that CJP, a minor who had been mauled by a dog, had various scars, as was the medical testimony. He was actually missing approximately 300 centimeters of flesh and muscle. And our firm retained an expert by the name of Rebecca Bush. Ms. Bush is an expert in the area of medical billing, and she was retained to give an expert opinion as to future medical costs related to the surgery of CJP. Both parents, as I stated, testified that they would like CJ to have scar revision surgery. His doctor stated that he could have it. And quite frankly, the testimony and photographs of the minor, as well as his presence in court, would indicate that it was an obvious injury that required repair. We had filed a motion in limine requesting that Ms. Bush's testimony be admissible. The defendant obviously did not want to come in. The court at a pretrial hearing stated that the defendant's objections to Ms. Bush were matters of cross-examination and went to the weight of her testimony and not its admissibility. Good morning, counsel. Good morning. With respect to the issue you're starting to talk about, in order to allow her testimony, would the trial court have had to have seen evidence of details of what the surgery would exactly entail in the future in order to allow testimony beyond cross-examination? The treatments, the exact services, because you're talking about CPT codes and details. Those CPT codes go with specific treatments and steps and medications and anesthesia, etc. Was there actually that type of evidence that had been introduced or was going to be introduced? What was going to be introduced, and by way of fact, what Ms. Bush did, was she looked at the deposition testimony of CJ's treating physicians along with medical records. She had what was called a physician's query with doctor stamps. That was part of her analysis, but not the entirety of it. Ms. Bush then gathered that information and related it or translated it into these CPT codes to project out what surgery and what procedures, as well as tangentially things such as preoperative, postoperative appointments would be necessary. What Ms. Bush did was gather the information and then give an estimate based on the CPT codes of what she believed would be necessary. Those specific requirements or specific projections on her part were based on her training and experience in the medical field for the better part of 30 or 40 years. She is a world-renowned expert in this field and has given these opinions a multitude of times. She then takes those calculations and creates a range based on a conservative range, if this child just needs one surgery, if it went well, versus a more complicated view of if something went wrong. She would then proceed to give a range of future medical costs based on her analysis. The trial court said that was fine and any issues related to that would be subject to cross-examination. Should there have been something that the defendant thought that the underlying treating physicians didn't testify to, she could be cross-examined to that. That is how we proceeded forward to trial. Literally during trial on October 24, after jury selection had commenced, the court then reversed its position, as is laid out in great detail through our brief and reply brief, and said that there was improper foundation for some of these opinions. The court ended up creating its own legal standard, which, in our opinion, was an abuse of discretion and violated well-settled Illinois law. Excuse me for interrupting, but certainly it is the prerogative of the trial court to revisit pre-trial rulings, correct? It can, yes. I would suggest that after jury selection, during trial, to then state that we're not going to let this evidence in is probably not the best timing, given the plaintiff had moved to continue it. It was denied. But can a court reconsider rulings? Yes. Well, it's inherent in an in limine order that the court will examine its pre-trial rulings as the evidence comes in, because certainly the evidence doesn't always come in in the same way that it's been represented in a pre-trial setting. But here, in follow-up to Justice Zianoff's questions, and specifically as to the fat grafting procedure, which is what you are focusing on in your brief, did a medical expert testify to the need for a fat grafting procedure? It was not specifically delineated by either Dr. Stams or Dr. Bueno. And is that a problem? No. And why not? Because it's our position that Illinois law does not require a treating physician to delineate a laundry list of future medical procedures for a variety of reasons. But the main one is that Illinois law states that when an injury is so readily apparent as what we are dealing with now, it is the purview of the jury to determine what factually is necessary. When we have an apparent injury like 300 centimeters of muscle and fat taken out of a young child's arm, Dr. Bueno and Dr. Stams both said that scar revision surgery was likely the best mechanism to repair this child's body. The courts have stated that once there's an underlying opinion, the doctors don't need to say they need to use this anesthesia with this procedure at this facility. That would, quite frankly, put an onerous burden on plaintiffs, as we are limited in the amount of time that we can spend with a doctor. What's your best case for that proposition? That the physician does not have to say what the future medical care will be? The case we cite in our briefs is the, if you could bear with me for one second. Richardson v. Chapman, Illinois Supreme Court, 175, Il 2nd, 98. It says the trier of fact enjoys a certain degree of leeway in awarding compensation for medical costs that, as shown by the evidence, are likely to arise in the future but are not specifically itemized in the testimony. We interpret that to mean that testimony as to future medical care does not need to be delineated and that when Ms. Bush takes a review of the depositions and medical records with her background, training, and experience, that she can then state and project out with CPT codes what would be reasonably likely to be incurred. And I would note that in his offer of proof, Dr. Stams agreed with that. But to answer your question, well, I think that's the best answer we have, quite frankly. If scar revision surgery and fat grafting were synonymous, and it was well known that that was the case, and perhaps you would have a point there, but are the two the same? Is a scar revision surgery synonymous with a fat grafting surgery? It's part of it. So a scar revision, when you have just like a superficial scar on top of your skin, there's a number of different procedures that they can do. One is what they would call a scar release to try to soften the scar as time goes past. The fat grafting deals with the underlying subcutaneous fat and muscle. And so the scar revision for CJ would be twofold, would be addressing the physical scar that we see along with the lapse or lack of fat and muscle. If what you're saying is, if that argument is to be followed, then a lay juror would have to be able to, that would have to be common knowledge to the lay juror then. You're saying that that wouldn't have to come from a medical expert, that the lay juror would know that. And is that the case that lay people should know what a fat grafting procedure is? No, we are saying that is what Rebecca Bush's testimony was for. Well, Rebecca Bush didn't testify as a nursing expert per se. She didn't testify to medical opinions or testify, wasn't disclosed to testify as to those things, correct? No, but she was testifying as a billing expert, that would be the projected out billing. And based upon a review of the medical records as well as the deposition testimony, that is what her opinion was. But the jury was unable to hear that. Go ahead, please. I'm sorry, I thought I lost it. So as it relates to Rebecca Bush's testimony, it's our position that the court abused its discretion by barring that testimony, that such testimony was in the purview of the jury. The jury could consider it or not consider it based upon the way that it prescribed it. But by barring it flat out, the plaintiff was unable to even put it in front of the jury. The next issue we had related to Dr. Bueno's testimony, the court, in addition, struck that during trial as well. And we have alleged that the court abused its discretion and did not follow the Decker standard. The defendant states that we are unable to delineate or state why there was prejudice in that. This case where the largest fights occur, as this court is likely aware, is related to the future medical care. And Dr. Bueno concurred that CJ required future medical care and said that scar revision surgery would be appropriate. So his concurrence would further bolster both Dr. Stam's as well as Rebecca Bush's testimony. Mr. No, the bigger issue, it's not a lack of prejudice, it's the admissibility of an opinion when Dr. Bueno hadn't seen the child in almost a year. And doesn't the case law indicate that that type of opinion is inadmissible? That is one of the factors. But when the injury is so obvious as to be permanent, the doctor doesn't need to see him as frequently or as close in time as would be required if it was not a permanent disability. But based on the significant injury to CJP, it's our position that he doesn't need to see him to know that it was a permanent scar. It is a permanent scar. When in proximity to the dog bite, did Dr. Bueno last see the child? I'm sorry, I could not hear you there. Yes, when in proximity to the dog bite, to the dog attack, did Dr. Bueno last see the child? I believe it was eight months to a year subsequent to the dog bite. I believe Dr. Bueno moved out of the Springfield area down to Nashville, Tennessee. And the wounds were still healing at that last visit, is that right? Correct. Well, in terms of the proposition that you just suggested, that a doctor does not have to see the patient to be able to testify as to future scarring, isn't it a fact that the doctor would have to see the patient when the patient was fully healed to determine what the extent of the scarring was then? In this case, I would say no, because it was readily apparent what the nature of the scarring was going to be. Okay, and I'm sorry, Justice Doherty, I think I stepped over your question. Did Dr. Bueno indicate he himself had some issues in terms of testifying to future consequences for the child when he had not seen him recently? Yes, he did state that, but again, I would suggest that that was related to any specific treatment, not to the permanent disability and the extent of the injuries. The injuries didn't change. The need for surgery or scar revision didn't change. Well, didn't he say that it would be speculation for him to give testimony on that? I believe that is correct, yes. How would that ever be appropriate in a court of law then, to have an expert opinion self-limit his testimony as speculation? Well, he could say it's speculation because at the time he gave a deposition, but it doesn't change the underlying issue related to CJ. CJ has a huge chunk of muscle and fat missing out of his arm. He has scars all over, which are readily apparent when you look at him. That disability incurred by the dog bite doesn't change. He would still need scar revision surgery. Whether Dr. Bueno recommended a specific type of surgery or revision therapy, I think could be speculative, but it doesn't change the underlying permanent disability as laid out in Decker. The thing is, counsel, all these things that you're suggesting are so obvious, it would seem like it would be easy, if it's so obvious, to have a medical expert say it, and we're missing that. Well, as Dr. Stams noted in his offer of proof, most physicians aren't in the business of giving future medical costs. So Dr. Stams said it was reasonable to have scar revision surgery. Yeah, but we're not talking about the physician giving medical cost testimony. We're talking about medical treatment, and I think that is their expertise. And he said that he would need scar revision surgery. He said it was not imperative, it was optional, correct? He said they could elect to have it done, and both parents said that they wanted it done on behalf of the minor. They wanted to wait until he was older, as he was at the time of trial six years old, and they wanted to wait until he was older to have that procedure, which personally I think is a reasonable course of action. So when you are looking at a future medical care, we would defer to the parents. The parents both said that they wanted to have these scars revised. There was some difference on the total amount, but when Dr. Stams says he believes scar revision surgery is appropriate, the parents say that they want to have it, it would likely to be incurred at that point, pursuant to Illinois law and future medical care. Please go ahead. I know my time is getting short. I wanted to address the court's limitation of the use of the term pit bull. The animal was a pit bull. Illinois law assumes that all animals are peaceful, and that we look at the individual animal. Counsel, I know your time is short, but isn't there a stigma associated with pit bull, and wasn't the opportunity there for a full description of the dog in terms of size, weight, et cetera? Is there a stigma related to pit bull? I don't know the answer to that. I would suggest that there was no evidence demonstrating that there was. As it relates to the full description of the animal, the defendant had no photographs of her animal, although they were requested. We had one police officer who was supposed to take photographs, but could not because the dog was snarling, and we could not get into that. There was an opportunity from a six-year-old to describe it. That testimony was different from that of the animal controller police officer, as well as the neighbor's dog. The purpose of having pit bull is important because the medical professionals are relying on the breed of animal when they are treating CJ. The bite, the force, the size, all of that is related, in addition to the fact that the defendant was arguing that CJ provoked the animal by going up to pet it and was mauled by this dog. Mr. Knoll, I'm sorry, you may not have seen it, but your time has expired here for argument. You'll have time in rebuttal. Mr. Suti, you may present your argument. Thank you, Your Honor. May it please the court. I'll take a moment to address the points that some of Your Honors brought up in questioning. Justice Zinoff, you are correct. The court did allow the witnesses to testify to the size and weight of the dog, and I do believe there is a stigma regarding pit bulls. And that was the purpose of my motion in limine on that topic, and I think the court ruled correctly on that point. I don't think there was any prejudicial limitation to the evidence that would have made a difference in determining liability in this case. Mr. Suti, in that regard, there was an award for past emotional distress, is that right? That is correct, Your Honor. There was an award for past emotional distress. Okay. An argument could be made that the breed of dog would be relevant, probative to the child's trauma. I mean, I think there's an arguable distinction between just the sense of an attack by a pit bull, just the size and physique of a pit bull versus, say, a golden retriever. I think this is still accurate. There are more dog bites by golden retrievers than there are any other breed. But just in terms of emotional distress, if the child had talked about the fear he had of this, you know, the appearance of the dog or maybe was having nightmares as to this dog, wouldn't the breed of dog come into play there? Wouldn't it be probative? Perhaps, Judge, if there was such evidence that a particular breed of dog scared the plaintiff more than others. But I do not recall any such testimony being brought forward. This child or this plaintiff was, I believe, four years old at the time of the bite. There's no evidence that he knew what the breed of the dog was. And there is evidence that he continued to live and reside with dogs of his own. Theoretically, in that situation, could it have been relevant? Perhaps, but that was not the case in this trial, Your Honor. No such evidence to my recollection was presented. OK, thank you. Moving forward to Dr. Dr. Bueno clearly said that he would be speculating to offer opinions on the type of treatment, if any, that would be necessary. Dr. Harrison inquired about the last treatment Bueno had in relation to the dog bite. The dog bite occurs in July, July 19, 2020. Dr. Bueno's last treatment, per my notes, is October 14, 2020, which would have been three months post-bite. In this case, went to trial in October of 2022, which then would have been two years after Dr. Bueno had last seen the patient. So I think the court was definitely correct in barring any testimony from Bueno, who himself admitted testimony about future treatment, the need for it, the necessity and causation that he'd be speculating. Most particularly in light of the fact that plaintiff was able to present providers who did testify about the condition of CJ, the plaintiff's injuries in a more recent, at a time more recent to the trial, which would have been his nurse practitioner and Dr. Stamps. So I think that the court was definitely correct there. And I don't see how the plaintiff can establish that the court abused his discretion on that point, nor really any prejudice on that topic. Then that brings me to the biggest issue in this case, and I believe that's the testimony of. Of Rebecca Bush. And first off, I know that her testimony was not fully. And plaintiff brings up appellant brings up that the court initially denied our motion, eliminated, then revisited it. And I believe that Dr. Justice Harris mentioned this. Motions eliminate our interlocutory rulings and are subject to change throughout the pendency of trial. And the court was correct in its rulings here because Rebecca Bush emphasizes she's not offering opinions on causation or treatment, but she does provide opinions on a multitude of treatments that no one testifies to those include. Excuse me, but these were permanent, very serious injuries. Wasn't really the issue just timing at what age the child might need this or or want. Certainly, if these were permanent scars, the nature that have been described. I mean, why was there a question as to this? Well, I think that timing certainly is an issue and the necessity of such a treatment, but I think what's somewhat lost in the discussion of this is it isn't the plaintiff. Can't ask for future treatment or an award plaintiff sites, a lot of case law discussing the lack of need of specificity of certain testimony here. Or generally to receive an award, but what plaintiff was requesting of the court is I want to present this specific evidence about these specific charges. And when plaintiff is going to do that, you have to present the proper foundationary evidence to support the admission of that evidence at trial. That's where Miss Bush fail. So what what evidence would have provided the basis then? I mean, other than a scar revision and perhaps the fat replacement, what else? I mean, she had the details about CPT. There are various nuances for these different medical procedures. What evidence would have provided the basis? Well, I think if you're going to do that, you need to have an occupational. For instance, let's talk about occupational therapy. That was one of the charges that was that was proposed that she would testify to. I think you would need a physician to testify that you are going to need that occupational therapy for this particular treatment that's reasonably necessary to occur in the future. Similarly, if you're going to say this patient needs this psychological evaluation, these many psychological counseling sessions, you need to have a mental health professional testify that the child has been examined. He has these conditions and this is how we treat those conditions. That's what you need is a provider in those fields to offer those opinions. And that's why Dr. Stam's testimony was sufficient on certain points that the court allowed certain charges to be admitted into evidence. Those that were actually supported by a qualified medical provider who had treated CJ. So, I hope that answers. Oh, I'm sorry. Go ahead. I was just going to ask, do you think the analysis differs? And if so, how when we're talking not about a physician recommended treatment. But an elective cosmetic surgery is a standard different. Are we just saying that if the person chooses and reasonably chooses a surgery that it should be compensated? I think that the standard remains that you are receiving necessary treatment for injuries caused by the accident. Now, let's talk more specifically in regard to the type of injuries that the plaintiff had in this case. As you recall, I can tell that your honors paid close attention to the details in this case. Dr. Stam's testified that CJ had no adhesions. Adhesions being where there's sticking points to the different layers of the skin, muscle, etc. If Dr. Stam's testified, yes, it's necessary for his proper skin growth to avoid further complications for proper range of motion. Absolutely, I would say that would be necessary. Now, if you're saying we're just doing beautification here, I think it's going to be a question of fact as to whether a doctor testifies that that is in fact necessary treatment. And I think it's probably going to turn on the specific facts of the case. I mean, Mr. Steele, we're talking about two related but distinct issues regarding future medical care. You're talking about Rebecca Bush's testimony being limited as to certain things, occupational therapy, mental health evaluations. Previously, we had talked about the pack rafting procedure. Those were areas that the trial judge limited Ms. Bush. She was, however, allowed to testify in regards to the cost of scar revision surgery, correct? I believe scar revision surgeries and injections that would, the court, I'm sorry, not the court, but the doctor testified would help soften the scar tissue. So Dr. Stamps had provided the initial foundational testimony that the child could have elective scar revision surgery in the future and or steroid injections. And then Rebecca Bush was allowed to take that testimony and project future care costs. And the jury heard that testimony. Is that right? That's exactly right, Your Honor. And to piggyback that on Justice Dougherty's question, I'm pretty sure I objected to the admission of that. Evidence is not sufficient for the necessity requirement. I do believe that the trial court disagreed with me on that point. Okay. And then in conjunction with Dr. Stamps' testimony, as we just mentioned, Rebecca Bush's testimony, as we just mentioned, the child's mother testified and actually pointed in photographs to the jury the particular scars that she indicated they would wish to have revised in the future. And I think maybe there were 13 in total. Is that right? That's correct with my recollection, Judge. In fact, I specifically remember during trial, there was a overhead projector up with the photographs of scars and they were put on that on the various spots of the photographs. Then I'm certain that was received into evidence. But you are absolutely correct on how that proceeded. Okay. If the jury had returned an award for all 13 of those scar revision surgeries, and I think the cost of each was projected to be over $10,000, would the evidence have supported that verdict? I think that there's an argument to be made that it would not have been against the manifest weight of the evidence. But on that point, I would note that there is multiple different kinds of evidence established that CJ had made an actual recovery. His motion, his strength was not limited by his injuries, etc. So there was much evidence rebutting the necessity of that. I do want to point out, Judge, in reference to a case cited by plaintiff, I'm going to butcher this name, Polisuk v. Winkler, 387 Ill App 3rd, 474. They cite another case, actually a long line of cases that states, a jury's award will not be found to be against the manifest weight of the evidence merely because it can be characterized as less than generous. Downward in the case at page 497, it states, jurors have the right to reject all or part of Marie's medical witness's testimony. It's up to the jury to make the credibility determinations concerning who it is going to believe. Yes, where my next question was going to go, which is here, given the testimony of Dr. Stams, Rebecca Bush, and the child's mother, regarding the future scar revision surgeries, was the jury free to reject the proposition that the child would have 13 scar revision surgeries in the future and the cost of each? They absolutely were, Judge. That is within the province of the jury. And I think the fact that both of the child's parents had not vigorously pursued, continued treatment, supported such a determination on their part, there was certainly evidence to contradict the claims of the need for future treatment and the necessity of it. So I think the jury was within their province to award some or none. And what if the award for future medical was $10,000? What did that represent? Your Honor, you're asking me to pick the brains of the jurors and what they decided to award. It's pretty close to one injection. Again, I think that would be supposition on my part. But I mean, if you were asking me to speculate, that's what I would speculate. They thought one injection. Is it a problem that we can't easily identify what it is they gave money for? No, Your Honor, it's not. There's actually a specific case law that discusses the awards. And I could pull a case for you if you'd like. It might take me a little bit, but there's no exact science to the return of awards from a jury. And I don't think that even if we disagree with the amount awarded, that it's justification for sufficiently meets the standard to reverse the jury's verdict on damages. Okay, thank you. So, I think we've touched base on a lot of Rebecca Bush's testimony. And I think that a lot of this tied into with the timing of what's going on. And I think Justice Zinoff mentioned this. It's the timing of what's being disclosed. We had nailed down Dr. Stam's testimony in a discovery deposition and an evidence deposition. And then Rebecca Bush is coming in after we're proceeding trial, putting additional information on top, adding these other costs. To move forward on some of the other topics discussed by plaintiffs, there is a discussion of comparative fault. There was no jury verdict tender for comparative fault. It was not argued that a reduction should occur. There was a strong discussion of provocation, the facts of the case, and how that tied in. So, I do not believe the court ruled incorrectly on that. And I would also note that plaintiffs' objections largely revolve around what I understand to be my opening statements and closing arguments. There's no objection while I was making those opening statements and closing arguments to those topics. So, I believe such a point as brought by the plaintiff and the appellant in their appellate arguments on that issue was waived. Going back to the breed of the dog, I think that, again, noting that plaintiff received a verdict on liability, I don't believe there's any prejudice shown. We did discuss in our prior discussion how it might be affected by potentially mental suffering. Plaintiff had mentioned the physician's query regarding Rebecca Bush, and that did cause a large discussion at the trial court level, and I think the court ruled appropriately on that. There was no opportunity to determine what was discussed during that conversation with Dr. Stams. The defense had no opportunity to cross-examine Dr. Stams on what was said. And allowing that would have allowed the force of expert testimony or, theoretically, a medical expert offering opinions on these treatments that no qualified provider, i.e., a doctor, had or would present to the jury. So, I do believe the court ruled correctly on the exclusion of testimony presented in that regard and properly limited it, the future testimony, to what was supported by the qualified medical providers in their testimony. Plaintiff mentioned the post-mite behavior of this dog, being that the dog was excited, that this police officer was essentially apprehensive about approaching the dog. What happened with this dog after it bit someone bore no relevance to the questions for the jury to decide. Those being, did plaintiff and the dog and my client, did the facts surrounding them, satisfy a cause of action under the Illinois Animal Control Act? And number two, did the facts of the case satisfy the elements of a common law liability claim? Under a common law liability claim, you have to satisfy the one bite rule. But what that goes to is the owner of the dog's knowledge of vicious propensities of that animal prior to the bite. The fact that the dog is acting viciously after the bite does nothing to prove what was known before the bite. And not only that, you're describing the behavior of a dog after it's just bitten somebody, after someone has rushed out to pull this child away from him, and likely after there's ambulances with lights and sirens on in this dog's home area, it's not of any relevance to the matters that were in dispute at that time. So I believe the court acted within its discretion in excluding that evidence. Plaintiff argued for the court was incorrectly denied the motion for directed verdict. I would argue the plaintiff cannot demonstrate any prejudice by that denial. I see my time is up. Thank you, Your Honor, for your time and attention in this case. Okay, thank you, Mr. Schutte. Mr. Knoll, rebuttal argument? Thank you, Justice. I believe you had requested the best case. I would point to page 19 and 20 of our appellate brief. The trier of fact enjoys a certain degree of leeway in awarding compensation for future medical costs that, as shown by the evidence, are likely to arise in the future, but are not specifically itemized in the physician's testimony. I am probably going to butcher this as well, but that'd be Scheibel v. Groetka, 183 Ill App III. There's also Levin v. Welsh Brothers Motor Service and a number of other cases. We have a fundamental disagreement with the defendant's proposition that there has to be an expert in each field to give an underlying opinion as to future medical. So by way of example, scar revision surgery, they are putting a scalpel or cutting somebody open. You need to have a testimony from an anesthesiologist to state that that would be required. There are certain aspects to a medical procedure which are inherently involved in that procedure. But don't we need to know the procedure, whether it's under general, in order for the cost estimator to work from that premise to give us the amount? Was the question, do you need to know the procedure? Don't we need to know what the procedure is before the cost estimator can tell us what the procedure will cost? Does she need to know whether it's under general anesthesia? I don't know off the top of my head if all scar revisions are or are not under general anesthesia. With respect to Rebecca Bush's testimony, I believe she's reviewed the medical records, did the physician's query, which is customary in her profession to do that. And so that's how she arrived at her ultimate opinion. You're talking about Rule 703, which is an expert being able to testify to things which are not themselves admissible. But isn't there a big yellow, if not red flag when those conversations are not in the course of their business, but in preparation for litigation? No, because she is getting the underlying information that she needs to make her opinion reliable. We had moved to continue and reopen Dr. Stamm's death. The defendant objected to that and then later complained that they couldn't cross-examine. There was literally no way for the plaintiff to comply with the court's order based on the rulings that it made. Wouldn't the way to comply be to get that information that your other expert needs from Dr. Stamm before the doors close on his discovery? If that's possible, but we hadn't identified Rebecca Bush as the expert at that point. And again, this is a young child who's healing. Those scars take time. And we filed the motion, don't quote me on the exact date, but approximately eight months in advance. And again, these rulings are being made after jury selection. I wanted to ask you about that too. How would the situation have been different if the first time the judge considered this, he had ruled the same way that he did later? I mean, discovery was already closed, right? The doors were closed on discovery. How were you prejudiced by the judge making that ruling later rather than when he first addressed it? We had prepared for trial and had selected a jury at that time. Then the court, for lack of a better term, gutted all of our future medical care during trial. How would it have been different if that ruling had been made earlier? Well, it's potential that we would have settled or given our client different legal advice given the court's rulings. We had a jury selected, and to be frank, the judge had the same information at the final pretrial that she had on October 24th. The testimony related to evidence depositions, it didn't change. Right, but you're arguing against what you've conceded is appropriate, that a judge can reverse an interlocutory ruling. I agree that a judge can change its opinion, yes. So, the prejudice relates to our ability to plan to a trial and present the evidence that we anticipate coming in, which has then changed significantly over the course of days. Okay, Mr. Noll, it looks like you timed your pause well there. You're out of time. Counsel, we appreciate your arguments. This case will be taken under advisement and we will issue a written opinion.